## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

GREAT MIDWEST INSURANCE
COMPANY,

Case No. 5:15-cv-02392

Plaintiff,

vs.

MECHEL BLUESTONE, INC.,
DYNAMIC ENERGY, INC.,
GARY HUFF, ZOLA HUFF,

Defendants.

### INTRODUCTION

1.    This is a civil action seeking declaratory relief in connection with the duties and

obligations under two insurance policies and is being brought under the Court's diversity

jurisdiction.

2.    Plaintiff, Great Midwest Insurance Company is seeking declaratory rulings under

West Virginia law that it has no duty to defend or to indemnify the insureds under the policies in

question for the claims asserted in the underlying litigation based on the express terms and

conditions of the policies and due to late notice and prejudice.

### PARTIES

3.    Plaintiff, Great Midwest Insurance Company ("GMIC") is an insurance company

organized under the laws of Texas, with its principal place of business in Houston, TX.

4.    Defendant, Dynamic Energy, Inc. ("DEI"), upon information and belief is a

company organized and incorporated under the laws of West Virginia with its principal place of

in Beckley, WV.

202077829

5.      At all relevant times, DEI has conducted mining operations on Coal Mountain, located in Wyoming County, WV.

6.      Defendant, Bluestone Coal Corporation ("BCC"), upon information and belief is a company organized and incorporated under the laws of West Virginia with its principal place of business in Beckley, WV.

7.      Upon information and belief BCC regularly conducts business in Wyoming County WV.

8.      The following case is currently pending in the Circuit Court of Wyoming County West Virginia against BCC and DEI:   *Huff v. Dynamic Energy, Inc.* et al. No. 13-C-206 filed on December 30, 2013 ("Underlying Lawsuit").

9.      Defendants Gary Huff and Zola Huff, are plaintiffs in the Underlying Lawsuit and reside at 193 Josh Fork, Simon, Wyoming County, West Virginia (jointly "Underlying Plaintiffs).

## Jurisdiction and Venue

10.     Jurisdiction is appropriate in this matter pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship exists between the Plaintiff, on one hand, and the Defendants, on the other hand, and because the amount in controversy exceeds $75,000, exclusive of costs, interest and legal expenses.

11.     This Court has jurisdiction over this matter pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure.

12.     Venue is appropriate in this matter pursuant to 28 U.S.C. §1391(b)(1) and (2) because all defendants reside in the Southern District of West Virginia and the events giving rise to the claims at issue arose in whole or part in the Southern District of West Virginia.

## Insurance Policies

13.    GMIC issued general liability policy No. GL00039914-01 effective December 31,

2013 to December 31, 2014 to Mechel Bluestone, Inc. ("Primary Policy").  (A true and correct

copy of the Primary Policy is attached hereto as Exhibit A.)

14.    By endorsement DEI and BCC are "named" insureds under the Primary Policy.

(See Exhibit A at Named Insured Schedule.)

15.    The Primary Policy has a limit of $1,000,000.00 for each "occurrence" and a

general aggregate limit of $2,000,000.00.  (Exhibit A at Declarations Page.)

16.    The Primary Policy is a general liability policy and contains the following

language regarding the scope of coverage:

### SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.    **Insuring Agreement**

   a.    We will pay those sums that the insured becomes legally obligated
to pay as damages because of "bodily injury" or "property damage"
to which this insurance applies.  We will have the right and duty to
defend the insured against any "suit" seeking those damages.
However, we will have no duty to defend the insured against any
"suit" seeking damages for "bodily injury" or "property damage" to
which this insurance does not apply.

   * * *

   b.    This insurance applies to "bodily injury" and "property damage"
only if:

   (1)    The "bodily injury" or "property damage" is caused by an
"occurrence" that takes place in the "coverage territory";

   (2)    The "bodily injury" or "property damage" occurs during the
policy period; and

     **(3)**    Prior to the policy period, no insured listed under Paragraph 1. of Section II - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   **c.**    "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1**. of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   **d.**    "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1**. of Section II -Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

     **(1)**    Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

     **(2)**    Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

     **(3)**    Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

\*\*\*

(Exhibit A at Commercial General Liability Coverage Form, CG00 01 12 07, page 1 of 16.)

    17.    The Primary Policy includes a Total Pollution Exclusion Endorsement that states:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**TOTAL POLLUTION EXCLUSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2., Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

    **f.**    **Pollution**

        **(1)**    "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

        **(2)**    Any loss, cost or expense arising out of any:

            **(a)**    Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

            **(b)**    Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

(Exhibit A at Total Pollution Exclusion Endorsement, form CG 21 49 09 99.)

    18.    The Primary Policy contains the following language regarding who is an "insured" under the Primary Policy:

**SECTION II – WHO IS AN INSURED**

    **1.**    If you are designated in the Declarations as:

***

        **d.**      An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

(Exhibit A at Commercial General Liability Coverage Form, CG00 01 12 07, page 9 of 16.)

    19.    The Primary Policy contains the following relevant conditions:

### SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

**2.**    Duties In the Event of Occurrence, Offense, Claim or Suit

    **a.**    You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

        **(1)**    How, when and where the "occurrence" or offense took place;

        **(2)**    The names and addresses of any injured persons and witnesses; and

        **(3)**    The nature and location of any injury or damage arising out of the "occurrence" or offense.

    **b.**    If a claim is made or "suit" is brought against any insured, you must:

        **(1)**    Immediately record the specifics of the claim or "suit" and the date received; and

        **(2)**    Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

    **c.**    You and any other involved insured must:

        **(1)**    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

        **(2)**    Authorize us to obtain records and other information;

        **(3)**    Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

     **(4)**    Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

    **d.**    No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

***

(Exhibit A at Commercial General Liability Coverage Form, CG00 01 12 07, pages 10 and 11 of 16.)

    20.    The Primary Policy contains the following definitions relevant to the instant matter:

### SECTION V – DEFINITIONS

    **3.**    "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from these at any time.

    **5.**    "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

    **6.**    "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

    **13.**    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

    **15.**    "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

    **17.**    "Property damage" means:

        **a.**    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

        **b.**    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

(Exhibit A at Commercial General Liability Coverage Form, CG00 01 12 07, pages 13-15 of 16.)

21.     GMIC also issued commercial excess liability policy No. CX00040134-01

effective December 31, 2013 to December 31, 2014 to Mechel Bluestone, Inc. ("Excess Policy").

(A true and correct copy of the Excess Policy is attached hereto as Exhibit B.)

22.     By endorsement DEI and BCC are "named" insureds under the Excess Policy.

(See Exhibit B at Named Insured Schedule.)

23.     For general liability coverage the Excess Policy is excess of the Primary Policy

and applies if the applicable limits of insurance in the Primary Policy are exhausted.  (Exhibit B

at Schedule of Controlling Underlying Insurance, GMIC EX DS 01 10 12, page 2 of 3;

Commercial Excess Liability Coverage Form, CX 00 01 04 13, page 1 of 5.)

24.     The Excess Policy contains the following language regarding the scope of

coverage:

* * *

The insurance provided under this Coverage Part will follow the same provisions, exclusions and limitations contained in the applicable "controlling underlying insurance", unless otherwise directed by this insurance.  To the extent such provisions differ or conflict, the provisions of this Coverage Part will apply.  However, the coverage provided under this Coverage Part will not be broader than that provided by the applicable "controlling underlying insurance".

* * *

### SECTION I – COVERAGES

### 1.     Insuring Agreement

a.  We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "injury or damage" to which insurance provided under

this Coverage Part applies.

We will have the right and duty to defend the insured against any suit seeking damages for such "injury or damage" when the applicable limits of "controlling underlying insurance" have been exhausted in accordance with the provisions of such "controlling underlying insurance".

When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other suit seeking damages for "injury or damage".

However, we will have no duty to defend the insured against any suit seeking damages for which insurance under this policy does not apply.

\*\*\*

b. This insurance applies to "injury or damage" that is subject to an applicable "retained limit".  If any other limit, such as, a sublimit, is specified in the "controlling underlying insurance", this insurance does not apply to "injury or damage" arising out of that exposure unless that limit is specified in the Declarations under the Schedule of "controlling underlying insurance".

c. If the "controlling underlying insurance" requires, for a particular claim, that the "injury or damage" occur during its policy period in order for that coverage to apply, then this insurance will only apply to that "injury or damage" if it occurs during the policy period of this Coverage Part.  If the "controlling underlying insurance" requires that the "event" causing the particular "injury or damage" takes place during its policy period in order for that coverage to apply, then this insurance will apply to the claim only if the "event" causing that "injury or damage" takes place during the policy period of this Coverage Part.

\*\*\*

(Exhibit B at Commercial Excess Liability Coverage Form, CX 00 01 04 13, page 1 of 5.)

25.   The Excess Policy contains the following language regarding exclusions to

coverage:

**2.   Exclusions**

The following exclusions, and any other exclusions added by endorsement, apply to this Coverage Part.  In addition, the exclusions applicable to any "controlling underlying insurance" apply to this insurance unless superseded by the following exclusions, or superseded by any other exclusions added by endorsement to this Coverage Part.

Insurance provided under this Coverage Part does not apply to:

* * *

c.    **Pollution**

   **(1)**   "Injury or damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

   **(2)**   Any loss, cost or expense arising out of any:

      **(a)**   Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants; or

      **(b)**   Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, pollutants.

   This exclusion does not apply to the extent that valid "controlling underlying insurance" for the pollution liability risks described above exists or would have existed but for the exhaustion of underlying limits for "injury or damage".

***

(Exhibit B at Commercial Excess Liability Coverage Form, CX 00 01 04 13, page 2 of 5.)

   26.   The Excess Policy contains the following conditions:

**SECTION III – CONDITIONS**

The following conditions apply. In addition, the conditions applicable to any "controlling underlying insurance" are also applicable to the coverage provided under this insurance unless superseded by the following conditions.

* * *

**3.    Duties In The Event Of An Event, Claim Or Suit**

   **a.**   You must see to it that we are notified as soon as practicable of an "event", regardless of the amount, which may result in a claim under this insurance. To the extent possible, notice should include:

      **(1)**   How, when and where the "event" took place;

   **(2)**   The names and addresses of any injured persons and witnesses; and

   **(3)**   The nature and location of any "injury or damage" arising out of the
            "event".

**b.**   If a claim is made or suit is brought against any insured, you must:

   **(1)**   Immediately record the specifics of the claim or suit and the date received;
            and

   **(2)**   Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or suit as soon as
   practicable.

**c.**   You and any other insured involved must:

   **(1)**   Immediately send us copies of any demands, notices, summonses or legal
            papers received in connection with the claim or suit;

   **(2)**   Authorize us to obtain records and other information;

   **(3)**   Cooperate with us in the investigation or settlement of the claim or
            defense against the suit; and

   **(4)**   Assist us, upon our request, in the enforcement of any right against any
            person or organization which may be liable to the insured because of
            "injury or damage" to which this insurance may also apply.

**d.**   No insured will, except at that insured's own cost, voluntarily make a payment,
        assume any obligation, or incur any expense, other than for first aid, without our
        consent.

(Exhibit B at Commercial Excess Liability Coverage Form, CX 00 01 04 13, page 3 of 5.)

   27.   The Excess Policy contains the following definitions:

**SECTION IV – DEFINITIONS**

The definitions applicable to any "controlling underlying insurance" also apply to this insurance.
In addition, the following definitions apply.

**1.**   "Controlling underlying insurance" means any policy of insurance or self-insurance listed
in the Declarations under the Schedule of "controlling underlying insurance".

**2.**   "Controlling underlying insurer" means any insurer who provides any policy of insurance
listed in the Declarations under the Schedule of "controlling underlying insurance".

**3.**     "Event" means an occurrence, offense, accident, act, or other event, to which the applicable "controlling underlying insurance" applies.

**4.**     "Injury or damage" means any injury or damage, covered in the applicable "controlling underlying insurance" arising from an "event".

**5.**     "Retained limit" means the available limits of "controlling underlying insurance" applicable to the claim.

**6.**     "Ultimate net loss" means the total sum, after reduction for recoveries, or salvages collectible, that the insured becomes legally obligated to pay as damages by reason of:

      **a.**     Settlements, judgments, binding arbitration; or

      **b.**     Other binding alternate dispute resolution proceeding entered into with our consent.

"Ultimate net loss" includes defense expenses if the "controlling underlying insurance"

specifies that limits are reduced by defense expenses.

(Exhibit B at Commercial Excess Liability Coverage Form, CX 00 01 04 13, page 5 of 5.)

      28.     The Excess Policy contains the following endorsement related to mining:

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**MINING LIMITATION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

As respects the operations of any SURFACE mine it is agreed that:

      A.     This insurance does not apply to:

            1.     Injury to or destruction of underground property, or to the increased cost of reducing any underground property to physical possession above the surface of the earth, or to the expense incurred or rendered necessary to prevent or minimize loss of or damage to such property resulting from acts or omissions causing underground damage. The term "underground property", as used herein, means oil, gas, water or other mineral substances, including any title, interest or estate therein, which, at the time of the act or omission causing loss of, injury to or destruction of such substance, or loss, impairment, or reduction of the value of such title, interest or estate, has not been reduced to physical possession above the surface of the earth.  Such term also includes any well, hole, formation,

strata or area in or through which exploration for or production of any such substance is carried on, and any casing, pipe, bit, tool, pump or other drilling or servicing machinery or equipment which is located in any such well or hole beneath the surface of the earth at the time of the occurrence causing such loss, injury or destruction.

2. Any liability directly or indirectly arising out of, caused by, resulting from, contributing to or aggravated by the subsidence; sinking, settling, slipping, falling away, caving in, shifting, rising, eroding, mud flow, tilting, or any other movement of land or earth, if any of the foregoing emanates from a SURFACE mine, whether active; inactive or abandoned, or operations being conducted therein.

3. The investigation, settlement or defense of any claim or suit against an insured alleging actual or threatened bodily injury or property damage of any kind to persons or property which arises out of or would not have occurred but for the "Pollution Hazard" as defined below, or to pay any damages, judgments, settlements, losses, costs or expenses of any kind or nature that may be awarded or incurred by reason of any such claim or suit or any such actual or threatened injury or damage; or for any losses, costs or expenses arising out of any obligation, order, direction or request of or upon any Insured, including but not limited to any governmental obligation, order, direction or request, to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize irritants; contaminants or pollutants.

"Pollution Hazard" means an actual exposure or threat of exposure to the corrosive, toxic or other harmful properties of any solid, liquid, gaseous or thermal pollutants, contaminants, irritants or toxic substances, including smoke, vapors, soot, fumes, acids, alkalis, and waste material, consisting of or containing any of the aforementioned irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water.  Waste material includes any materials which are intended to be or have been recycled, reconditioned or reclaimed.

4. To any liability for restoration, reclamation, back-filling, grading, planting, covering or any other modification of mine workings, high walls, spoil banks, haulage ways or streams.

B. Except insofar as coverage is available to the Insured in valid and collectible underlying insurance as listed in the Schedule of Underlying Insurance, for the full limit shown, and then only for such liability for which coverage is afforded under the underlying insurance, this insurance shall not apply to bodily injury and property damage arising out of:

1.  Blasting or explosion other than the explosion of air or steam vessels, piping under pressure, prime movers, machinery or power transmitting equipment; or

2.  The collapse of or structural injury to any building or structure due to (i) grading of land, excavation, borrowing, filling or back-filling, tunneling, pile driving, cofferdam work or caisson work, or (ii) moving, shoring, underpinning, raising or demolition of any building or structure, or removal or rebuilding of any structural support thereof; or

3.  Injury to or destruction of wires, conduits, pipes, mains, sewers, tanks, tunnels, any similar property and apparatus in connection therewith, beneath the surface of the ground or water, caused by and occurring during the use of mechanical equipment for the purpose of grading land, back-filling, or pile driving.

It is further agreed that the policy does not apply to mining operations at any location other than those at which mining operations were being conducted at the inception of the policy period, unless the insured has notified the company prior to the commencement of such operations, and the company has issued an endorsement to the policy extending it to such operations.

(Exhibit B at Mining Limitation Endorsement.)

## Underlying Litigation

29.     MBI and BCC are currently defendants in the Underlying Lawsuit pending in the

Circuit Court of Wyoming County, West Virginia related to their mining operations on Coal

Mountain.

30.     The Underlying Lawsuit is based on the following allegations set forth in

paragraphs 31 to 44.

31.     Underlying Plaintiffs reside and are domiciled in Wyoming County, West

Virginia.  (A true and correct copy of the Complaint in the Underlying Lawsuit is attached hereto

as Exhibit C "Underlying Complaint."  Underlying Complaint at ¶1)

32.     They are the owners of certain valuable real estate situated at the local of 193 Josh

Fork, Wyoming County, Simon, West Virginia.  (Underlying Complaint at ¶2)

33.     Underlying Plaintiffs use the Josh Fork location as their primary family residence and have upon it a dwelling house, out buildings and other appointments necessary for their shelter and sustenance. (Underlying Complaint at ¶7)

34.     In the course of preparing their property for occupancy circa 1977, the Underlying Plaintiffs caused a well  to be drilled for the purpose of providing a fresh and potable source of water for every aspect of household use and particular agricultural uses including drinking, cleaning, cooking, bathing and sustaining healthy livestock. (Underlying Complaint at ¶8)

35.     For many years following the completion of the aforementioned well it provided plentiful and potable water for the Underlying Plaintiffs for all ordinary purposes. (Underlying Complaint at ¶9)

36.     That DEI and BCC, began mining operations on tracts which were adjacent to the Plaintiff's tract in or around the late 2000's and said mining operation was in the nature of an open surface mine, or strip mine. (Underlying Complaint at ¶10)

37.     That through and until the late winter of the year 2011 through early spring of 2012, the water from the Plaintiff's well became progressively  unusable, and is now to the point where it is unfit for human consumption in any aspect, including meal preparation, bathing, cleaning and laundering. (Underlying Complaint at ¶11)

38.     Underlying Plaintiffs' animals, their horses and dogs, will not consume this water. (Underlying Complaint at ¶12) Since the aforementioned time all water used for drinking, canning, cooking or washing clothes must be obtained off site and brought to the Underlying Plaintiffs' residence for consumption at great inconvenience, annoyance and cost to them. (Underlying Complaint at ¶13)

39.     The Underlying Plaintiffs cannot wash their personal vehicles because a brown or black gritty stain is left as a residue upon those vehicles. (Underlying Complaint at ¶14)

40.     Underlying Plaintiffs complained to the DEI and BCC, its agents and employees and representatives with regard to the spoliation of their source of drinking water with no satisfactory result. (Underlying Complaint at ¶15)

41.     In the course of their mining activity, the DEI and BCC have trespassed upon the Underlying Plaintiffs' property while asserting that the boundary between its operations and the Underlying Plaintiffs' homestead were inaccurate, and based upon that inaccuracy, either intentionally or negligently, have caused to be dumped upon Plaintiff's property large uprooted trees, boulders and other refuse associated with surface removal coal mining. (Underlying Complaint at ¶19)

42.     As a direct and proximate result of the ultrahazardous activity of the DEI and BCC, the Underlying Plaintiffs have been caused to lose a valuable source of fresh and potable water resulting in many months of suffering, inconvenience, annoyance, mental anguish and fear of bodily injury resulting in palpable deterioration in their emotional health and well-being, as well as unknown physical detriments to their person from inhaling, absorbing or otherwise coming into contact with the water and its fumes. (Underlying Complaint at ¶22)

43.     As a direct and proximate result of the ultrahazardous activity of the DEI and BCC, the Underlying Plaintiffs have been caused to lose the entire value of their home as sale of this property would require a full and complete disclosure to any potential buyer of the condition of the water available on the Plaintiff's property as there is no other readily available source of public or privately provided potable water. (Underlying Complaint at ¶24)

44.     DEI and BCC have, since such time that they were made aware of Underlying Plaintiffs' water problems, intentionally inflicted emotional distress upon the Underlying Plaintiffs in the use of subterfuge and delay in all of their dealings with the Underlying Plaintiffs. (Underlying Complaint at ¶25)

45.     All of the relief sought by Underlying Plaintiffs in the Underlying Lawsuit is based in whole or in part on the alleged contamination of groundwater and/or disposal of refuse. (See Causes of Action and prayer for relief in Exhibit C.)

### Count I – Prior Knowledge (Primary Policy)

46.     GMIC incorporates by reference paragraphs 1 through 45, above as if set forth at length herein.

47.     Since at least 2007 numerous different individuals, including Underlying Plaintiffs, have complained to the West Virginia Department of Environmental Protection ("WVDEP") about water quality being impacted by DEI's surface mining activities on Coal Mountain.

48.     Underlying Plaintiffs filed a complaint with WVDEP on or about February 1, 2007 regarding allegations that DEI and/or BCC's mining activity on Coal Mountain had negatively impacted their well water.

49.     Underlying Plaintiffs filed a complaint with WVDEP on or about March 19, 2012 regarding allegations that DEI and/or BCC's mining activity on Coal Mountain had negatively impacted their well water.

50.     In response the WVDEP investigated both complaints, and said investigations included contacting DEI and/or BCC, and in 2012 included water sampling and a visual inspection by helicopter of the affected area.

51.     WVDEP contacted DEI and/or BCC in connection with both complaints.

52.     An employee of DEI and/or BCC authorized to receive notice of an occurrence or claim received knowledge of the injuries complained of in the Underlying Lawsuit prior to the effective date of the Primary Policy.

53.     The Primary Policy became effective on December 31, 2013.  (Exhibit A.)

54.     Upon information and belief the Underlying Plaintiffs also contacted DEI and BCC directly in 2011, 2012 and in 2013 to voice their concerns regarding the negative impact to their property, well water, and health and well-being caused by DEI and BCC's mining operations.

55.     The Primary Policy does not apply to "bodily injury" or "property damage" if anyone identified as an insured has knowledge prior to the policy period that "bodily injury" or "property damage" had occurred in "whole or in part."  (Exhibit A at Section I, 1(b)(3) Commercial General Liability Coverage Form, CG00 01 12 07, page 1 of 16.)

56.      The Primary Policy provides that "executive officers" of a corporation are considered to be an insured.  (Exhibit A at Section II - Who is and Insured, 1(d) Commercial General Liability Coverage Form, CG00 01 12 07, page 9 of 16.)

57.     "Executive officer" is defined as "a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document." (Exhibit A at Section V, 6 Commercial General Liability Coverage Form, CG00 01 12 07, page 13 of 16.)

58.     Upon information and belief the Huffs contacted individuals at DEI and/or BCC who qualify as "executive officers" about their complaints regarding personal injury and property damage prior to December 30, 2013.

59.     The Underlying Lawsuit was filed on December 30, 2013.

60.     When the insured, "…knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period." (Exhibit A at Section I, 1(b)(3) Commercial General Liability Coverage Form, CG00 01 12 07, page 1 of 16.)

61.     ""Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any…" executive officer, "[r]eceives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or [b]ecomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur." (Exhibit A at Section I, 1(d)(2) and (3) Commercial General Liability Coverage Form, CG00 01 12 07, page 1 of 16.)

62.     DEI and/or BCC knew of the "bodily injury" or "property damage" alleged in the Underlying Lawsuit prior to the effective date of the Primary Policy.

63.     Any "bodily injury" or "property damage" alleged in the Underlying Lawsuit is not covered by the Primary Policy because it was known to DEI prior to the policy period.

64.     An actual controversy has arisen and now exists between GMIC and DEI and BCC concerning GMIC's duties and obligations under the Primary Policy in connection with the Underlying Lawsuit.

65.     Therefore, pursuant to 28 U.S.C. § 2201, *et seq.*, and Rule 57 of the Federal Rules of Civil Procedure, GMIC requests a declaration from this Honorable Court that: (i) the Primary Policy does not cover the claims arising from the Underlying Lawsuit; and (ii) GMIC has no

obligation under the Primary Policy to defend or indemnify either DEI or BCC in the Underlying
Lawsuit.

### Count II – Prior Knowledge (Excess Policy)

66.     GMIC incorporates by reference paragraphs 1 through 65, above as if set forth at
length herein.

67.     The Excess Policy follows form with the Primary Policy with regard to the timing
of "bodily injury" or "property damage". (Exhibit B at Commercial Excess Liability Coverage
Form, CX 00 01 04 13, page 1 of 5.)

68.     Any "bodily injury" or "property damage" alleged in the Underlying Lawsuit is
not covered by the Excess Policy because it was known to DEI prior to the policy period.

69.     An actual controversy has arisen and now exists between GMIC and DEI and
BCC concerning GMIC's duties and obligations under the Excess Policy in connection with the
Underlying Lawsuit.

70.     Therefore, pursuant to 28 U.S.C. § 2201, *et seq.*, and Rule 57 of the Federal Rules
of Civil Procedure, GMIC requests a declaration from this Honorable Court that: (i) the Excess
Policy does not cover the claims arising from the Underlying Lawsuit; and (ii) GMIC has no
obligation under the Excess Policy to defend or indemnify either DEI or BCC in the Underlying
Lawsuit.

### Count III – Pollution Exclusion (Primary Policy)

71.     GMIC incorporates by reference paragraphs 1 through 70, above as if set forth at
length herein.

72.     As fully set forth in paragraph 17, above the Primary Policy contains a "Total
Pollution Exclusion" that excludes coverage for ""bodily injury" or "property damage" which

would not have occurred in whole or part but for the actual, **alleged** or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time." (Exhibit A at Total Pollution Exclusion Endorsement.)

73.     ""Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed." (Exhibit A at Section V - Definitions, 15, Commercial General Liability Coverage Form, CG00 01 12 07, page 15 of 16.)

74.     The claims in the Underlying Lawsuit are all based on allegations of the discharge, dispersal, seepage, migration, release or escape of contaminants or waste.  (See Exhibit C.)

75.     All claims asserted in the Underlying Lawsuit are barred by the Primary Policy because they are based on allegations of the discharge, dispersal, seepage, migration, release or escape of contaminants or waste.

76.     The Primary Policy does not apply to any loss, cost, or expense arising out of any request, demand, order, or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any was respond to or assess the effects of "pollutants".   (Exhibit A at Total Pollution Exclusion Endorsement.)

77.     The Primary Policy does not cover any relief requested in the Underlying Lawsuit because it is all based upon responding to the effects of "pollutants."

78.     An actual controversy has arisen and now exists between GMIC and DEI and BCC concerning GMIC's duties and obligations under the Primary Policy in connection with the Underlying Lawsuit.

79.     Therefore, pursuant to 28 U.S.C. § 2201, *et seq.*, and Rule 57 of the Federal Rules of Civil Procedure, GMIC requests a declaration from this Honorable Court that: (i) the Primary Policy does not cover the claims arising from the Underlying Lawsuit; and (ii) GMIC has no obligation under the Primary Policy to defend or indemnify either DEI or BCC in the Underlying Lawsuit.

### Count IV – Pollution Exclusion (Excess Policy)

80.     GMIC incorporates by reference paragraphs 1 through 79, above as if set forth at length herein.

81.     The Excess Policy contains the same pollution exclusion as the Primary Policy. (See, (Exhibit B at ¶ 2, Commercial Excess Liability Coverage Form, CX 00 01 04 13, page 2 of 5.)

82.     The claims in the Underlying Lawsuit are all based on allegations of the dispersal, seepage, and or migration of contaminants.  (See Exhibit C.)

83.     All claims asserted in the Underlying Lawsuit are barred by the Excess Policy because they are based on allegations of the discharge, dispersal, seepage, migration, release or escape of contaminants or waste.

84.     The Excess Policy does not cover any relief requested in the Underlying Lawsuit because it is all based upon responding to the effects of "pollutants."

85.     An actual controversy has arisen and now exists between GMIC and DEI and BCC concerning GMIC's duties and obligations under the Excess Policy in connection with the Underlying Lawsuit.

86.     Therefore, pursuant to 28 U.S.C. § 2201, *et seq.*, and Rule 57 of the Federal Rules of Civil Procedure, GMIC requests a declaration from this Honorable Court that: (i) the Excess

Policy does not cover the claims arising from the Underlying Lawsuit; and (ii) GMIC has no

obligation under the Excess Policy to defend or indemnify either DEI or BCC in the Underlying

Lawsuit.

## Count V – Late Notice (Primary Policy)

87.     GMIC incorporates by reference paragraphs 1 through 86, above as if set forth at

length herein.

88.     As more fully set forth in paragraph 19 above, the Primary Policy requires, as a

condition of coverage, insureds to provide GMIC with written notice of a claim or suit as soon as

practicable and to immediately provide copies of any demands, notices, summonses or legal

papers received in connection with the claim or suit.  (Exhibit A at Section IV, 2, Commercial

General Liability Coverage Form, CG00 01 12 07, page 10 and 11 of 16.)

89.     The Primary Policy requires, as a condition of coverage, that insureds cooperate

with GMIC in the investigation or settlement of the claim or defense against a lawsuit and assist

GMIC in the enforcement of any right against any person or organization which may be liable to

the insured.  (Exhibit A at Section IV, ¶2(c)(3) and (4), Commercial General Liability Coverage

Form, CG00 01 12 07, page 11 of 16.)

90.     The Primary Policy also prohibits, except at the insured's own cost, voluntarily

making any payment, assuming any obligation, or incurring any expense.  (Exhibit A at Section

IV, ¶ 2(d), Commercial General Liability Coverage Form, CG00 01 12 07, page 11 of 16.)

91.     The Underlying Lawsuit was filed on December 30, 2013.

92.     Upon information and belief, DEI and BCC were served with the complaint on

January 22, 2014.

93.     DEI and BCC did not provide notice of the Underlying Lawsuit until December 10, 2014.

94.     Between being served with the complaints and providing notice to GMIC, DEI and BCC engaged in substantial activity in defending the Underlying Lawsuit, including but not limited to, hiring counsel, answering the complaint, engaging in substantial motion practice related to emergency water, engaging in substantial discovery, and engaging consultants and experts.

95.     Neither DEI nor BCC has responded to repeated requests for information regarding the Underlying Lawsuit.

96.     GMIC has been prejudiced in its right and duty to defend the Underlying Lawsuit by the late notice.

97.     GMIC has been further prejudiced by DEI and BCC's failure to cooperate in the investigation and defense of the Underlying Lawsuit.

98.     Such late notice and prejudice relieves GMIC of any obligation it may have had to defend or indemnify DEI and BCC in the Underlying Lawsuit.

99.     DEI and BCC are solely responsible for all costs incurred in defending and investigating the Consolidated Litigation incurred before December 10, 2014 when notice was given to GMIC.

100.    An actual controversy has arisen and now exists between GMIC and DEI and BCC concerning GMIC's duties and obligations under the Primary Policy in connection with the Underlying Lawsuit.

101.    Therefore, pursuant to 28 U.S.C. § 2201, *et seq.*, and Rule 57 of the Federal Rules of Civil Procedure, GMIC requests a declaration from this Honorable Court that: (i) the Primary

Policy does not cover the claims arising from the Underlying Lawsuit; (ii) GMIC has no

obligation under the Primary Policy to defend or indemnify either DEI or BCC in the Underlying

Lawsuit; and, (iii) GMIC has no liability for any and all costs or expenses incurred by either DEI

or BCC on or before December 10, 2014 in connection with the Underlying Lawsuit.

**Count VI – Late Notice (Excess Policy)**

102.    GMIC incorporates by reference paragraphs 1 through 101, above as if set forth at

length herein.

103.    The Excess Policy contains the same notice requirements, as a condition of

coverage, as the Primary Policy.  (Exhibit B at Section III, Commercial Excess Liability

Coverage Form, CX 00 01 04 13, page 3 of 5.)

104.    The Excess Policy requires, as a condition of coverage, that insureds cooperate

with GMIC in the investigation or settlement of the claim or defense against a lawsuit and assist

GMIC in the enforcement of any right against any person or organization which may be liable to

the insured.  (Exhibit B at Section III, 2(c)(3) and (4), Commercial Excess Liability Coverage

Form, ¶ 3 CX 00 01 04 13, page 3 of 5.)

105.    The Excess Policy also prohibits, except at the insured's own cost, voluntarily

making any payment, assuming any obligation, or incurring any expense.  (Exhibit B at Section

IVII, 2(d), Commercial Excess Liability Coverage Form, ¶ 3 CX 00 01 04 13, page 3 of 5.)

106.    Upon information and belief, DEI and BCC were served with the complaint on

January 22, 2014.

107.    DEI and BCC did not provide notice of the Underlying Lawsuit until December

10, 2014.

108.    Between being served with the complaints and providing notice to GMIC, DEI and BCC engaged in substantial activity in defending the Underlying Lawsuit including but not limited to, hiring counsel, answering the complaint, engaging in substantial motion practice related to emergency water, engaging in substantial discovery, hiring consultants and experts, and filing for summary judgment.

109.    Neither DEI nor BCC has responded to repeated requests for information regarding the Underlying Lawsuit.

110.    GMIC has been prejudiced in its right and duty to defend the Underlying Lawsuit by the late notice.

111.    GMIC has been further prejudiced by DEI and BCC's failure to cooperate in the investigation and defense of the Underlying Lawsuit.

112.    Such late notice and prejudice relieves GMIC of any obligation it may have had to defend or indemnify DEI and BCC in the Underlying Lawsuit.

113.    DEI and BCC are solely responsible for all costs incurred in defending and investigating the Consolidated Litigation incurred before December 10, 2014 when notice was given to GMIC.

114.    An actual controversy has arisen and now exists between GMIC and DEI and BCC concerning GMIC's duties and obligations under the Excess Policy in connection with the Underlying Lawsuit.

115.    Therefore, pursuant to 28 U.S.C. § 2201, *et seq.*, and Rule 57 of the Federal Rules of Civil Procedure, GMIC requests a declaration from this Honorable Court that: (i) the Excess Policy does not cover the claims arising from the Underlying Lawsuit; (ii) GMIC has no obligation under the Excess Policy to defend or indemnify either DEI or BCC in the Underlying

Lawsuit; and, (iii) GMIC has no liability under the Excess Policy for any and all costs or expenses incurred by either DEI or BCC on or before December 10, 2014 in connection with the Underlying Lawsuit.

## **Count VII – Mining Exclusion (Excess Policy)**

116.    GMIC incorporates by reference paragraphs 1 through 115, above as if set forth at length herein.

117.    As fully set forth above in paragraph 28, the Excess Policy contains a Mining Limitation Endorsement. (See also, Exhibit B at Mining Limitation Endorsement, GMIC EX00 21 61 11 11.)

118.    The Mining Limitation Endorsement expressly excludes injury to or destruction of underground property, which expressly includes water and wells, related to the operations of a surface mine. (See also, Exhibit B at Mining Limitation Endorsement, A.(1), GMIC EX00 21 61 11 11.)

119.    The Mining Limitation Endorsement also expressly does not apply to the investigation, settlement or defense of any claim or suit against an Insured alleging actual or threatened bodily injury or property damage that would not have occurred but of the actual exposure or threat of exposure to any contaminants including waste. (See also, Exhibit B at Mining Limitation Endorsement, A.(3), GMIC EX00 21 61 11 11.)

120.    All of the injuries are alleged to be the result of DEI and BCC' surface mining operations. (See Exhibit C.)

121.    All claims asserted in the Underlying Lawsuit are excluded from the Excess Policy by the Mining Limitation Endorsement.

122.     An actual controversy has arisen and now exists between GMIC and DEI and BCC concerning GMIC's duties and obligations under the Excess Policy in connection with the Underlying Lawsuit.

123.     Therefore, pursuant to 28 U.S.C. § 2201, *et seq.*, and Rule 57 of the Federal Rules of Civil Procedure, GMIC requests a declaration from this Honorable Court that: (i) the Primary Policy does not cover the claims arising from the Underlying Lawsuit; and (ii) GMIC has no obligation under the Excess Policy to defend or indemnify either DEI or BCC in the Underlying Lawsuit.

## Count VIII – No Coverage for Bodily Injury or Property Damage that did not occur in the Policy Period (Primary Policy) (Alternative)

124.     GMIC incorporates by reference paragraphs 1 through 123, above as if set forth at length herein.

125.     As more fully set forth in paragraph 16 above, the Primary Policy only applies to "bodily injury" or "property damage" that occurs during the policy period. (Exhibit A at Commercial General Liability Coverage Form, CG00 01 12 07, ¶ 1(b)(2), page 1 of 16.)

126.     The Primary Policy's policy period is 12/31/2013 to 12/31/2104 at 12:01 am Standard Time at the insured's mailing address of 100 Cranberry Creek Drive, Beckley, WV 25801. (Exhibit A at Common Policy Declarations, IL DS 00 09 08 GMIC 10 10, page 1 of 2.)

127.     The Underlying Lawsuit contains allegations involving "bodily injury" and/or "property damage" that did not occur during the Primary Policy period.

128.     In the event that coverage is found to exist for the claims asserted in the Underlying Lawsuit (which is denied as set forth above), then GMIC is only liable for "bodily injury" or "property damage" found to have occurred during the Primary Policy period.

129.     An actual controversy has arisen and now exists between GMIC and DEI and

BCC concerning GMIC's duties and obligations under the Primary Policy in connection with the

Underlying Lawsuit.

130.     Therefore, pursuant to 28 U.S.C. § 2201, *et seq.*, and Rule 57 of the Federal Rules

of Civil Procedure, GMIC requests a declaration from this Honorable Court that: (i) the Primary

Policy does not cover the claims arising from the Underlying Lawsuit involving "bodily injury"

or "property damage" that did not occur during the policy period; and (ii) GMIC has no

obligation under the Primary Policy to defend or indemnify either DEI or BCC in the Underlying

Lawsuit for "bodily injury" or "property damage" that did not occur during the policy period.

## Count IX – No Coverage for Bodily Injury or Property Damage that did not occur in the Policy Period (Excess Policy) (Alternative)

131.     GMIC incorporates by reference paragraphs 1 through 130, above as if set forth at

length herein.

132.     The Excess Policy follows form with the Primary Policy with regard to the timing

of "bodily injury" or "property damage". (Exhibit B at Commercial Excess Liability Coverage

Form, CX 00 01 04 13, page 1 of 5.)

133.     The Excess Policy's policy period is 12/31/2013 to 12/31/2104 at 12:01 am

Standard Time at the insured's mailing address of 100 Cranberry Creek Drive, Beckley, WV

25801. (Exhibit B at Commercial Excess Liability Declarations, GMIC EX DS 01 10 12, page 1

of 3.)

134.     The Underlying Lawsuit contains allegations involving "bodily injury" and/or

"property damage" that did not occur during the Excess Policy period.

135.   In the event that coverage is found to exist for the claims asserted in the Underlying Lawsuit (which is denied as set forth above), then GMIC is only liable for "bodily injury" or "property damage" found to have occurred during the Excess Policy period.

136.   An actual controversy has arisen and now exists between GMIC and DEI and BCC concerning GMIC's duties and obligations under the Excess Policy in connection with the Underlying Lawsuit.

137.   Therefore, pursuant to 28 U.S.C. § 2201, *et seq.*, and Rule 57 of the Federal Rules of Civil Procedure, GMIC requests a declaration from this Honorable Court that: (i) the Excess Policy does not cover the claims arising from the Underlying Lawsuit involving "bodily injury" or "property damage" that did not occur during the policy period; and (ii) GMIC has no obligation under the Excess Policy to defend or indemnify either DEI or BCC in the Underlying Lawsuit for "bodily injury" or "property damage" that did not occur during the policy period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Great Midwest Insurance Company respectfully requests that this Honorable Court:

1.      Enter an order declaring that there is no coverage under the Primary Policy for the Underlying Lawsuit, and that GMIC has no duty to defend or indemnify either Dynamic Energy, Inc. or Bluestone Coal Corporation in connection with the Underlying Lawsuit;

2.      Enter an order declaring that there is no coverage under the Excess Policy for the Underlying Lawsuit, and that GMIC has no duty to defend or indemnify either Dynamic Energy, Inc. or Bluestone Coal Corporation in connection with the Underlying Lawsuit;

3.      Enter an order declaring that GMIC has no liability for any and all costs or expenses incurred by either Dynamic Energy, Inc. or Bluestone Coal Corporation in connection with the Underlying Lawsuit;

4.      Award GMIC such other and further relief, including equitable relief, as the Court deems just and proper.

Respectfully submitted,

CLARK HILL PLC

Jennifer K. Mason, Esquire
1290 Suncrest Towne Centre
Morgantown, WV  26505
T   304.233.5599
F   304.233.5656

Attorneys for Plaintiff, Great Midwest
Insurance Company

Dated:  March 2, 2015